UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

────────────────────────────

JAMES PIERCE,                          :
                                       :
              Plaintiff,               :
                                       :
              v.                       :    Before: Richard K. Eaton, Judge[1]
                                       :
HIGHLAND FALLS-FORT                    :    Court No. 08-civ-1948 (RKE)
MONTGOMERY CENTRAL SCHOOL              :
DISTRICT, PHILIP B. ARBOLINO,          :
former Superintendent of              :
Schools, and LOUIS TROMBETTA,         :
High School Principal,                 :
in their individual                    :
capacities,                            :
                                       :
              Defendants.              :
────────────────────────────:

### OPINION and ORDER

Eaton, Judge:  Plaintiff James Pierce ("Pierce") commenced this action against: his former employer, the Highland Falls-Fort Montgomery Central School District (the "District"); the District Superintendent, Philip Arbolino; and the principal of James I. O'Neill High School, where plaintiff was employed, Louis Trombetta (collectively, "defendants").  By his complaint, plaintiff alleges discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA").[2]  Pl.'s Comp. ¶ 1.

───────────────

[1]    Judge Richard K. Eaton, of the United States Court of International Trade, sitting by designation.

[2]    Plaintiff has sued Arbolino and Trombetta in their individual capacities.

1

Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56 on the grounds that Pierce has failed, as a matter of law, to establish one or more of the essential elements of his claim. The court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (2006). For the reasons set forth below, the defendant's motion for summary judgment is granted.

BACKGROUND

The following facts are undisputed unless otherwise stated. Pierce commenced employment with the District in 2003 as a special education teacher. Pierce Dep. 14:23-24, July 9, 2010. At all relevant times, he claims to have suffered from major depressive disorder and drug addiction, both of which he claims were exacerbated by his son's suicide in 2000. Koskos Aff. ¶ 7. He also suffered from osteoarthritis in both hips for which he underwent surgery and was prescribed pain medication. Koskos Aff. ¶ 8. According to Pierce, the combined effect of these events caused him to abuse his prescription medications in an effort to self-medicate his pain and depression. Pierce Dep. 115:19-21.

From 1981 to 2002, Pierce taught at various schools in New York City. Pierce Dep. 12:6-15. His responsibilities ranged from teaching special education and drama, to administrative positions, such as program planner and transitional linkage coordinator. Pierce Dep. 16:2-3, 13:16-21, 14:6-13. Pierce

2

alleges his teaching evaluations were consistently "fine."
Pierce Dep. 17:6-8. Pierce began teaching in the District in
2003. During the 2003-2004 and the 2004-2005 school years, he
received positive reviews and served as Chair of the Special
Education Department. Pierce Dep. 30:12-15; Trombetta Dep.
33:19-21, Sept. 3, 2009.

In July 2005, Pierce was arrested for driving under the
influence ("DUI"). Pierce Dep. 140:9-25. He discussed this
incident with Principal Trombetta, and during this discussion he
told Trombetta that he attributed the incident to his use of pain
medication. Trombetta Dep. 50:17-20.

During the 2005-2006 school year, Pierce volunteered to run
the school's alternative education program and direct the
school's musical. At that time, he generally started to behave
in an erratic fashion. For example, he confronted another
teacher before a classroom of students, used profanity when
talking to students, gave students answers while they were taking
examinations, did not attend mandatory faculty meetings or
parent-teacher conferences, was frequently absent, and
consistently left school in the middle of the day without reason
or permission. Trombetta Dep. 49:2-25; Mem. from Trombetta to
Pierce, Jan. 18, 2007, Mar. 19, 2007, May 1, 2007 (Shrewsberry
Decl., Ex. I). Moreover, he did not use standard teaching

3

methods, such as assigning homework and drafting lesson plans.
Pierce Dep. 58:17-24, 59:5-11.

In fact, plaintiff was absent for forty-four days during the
2006-2007 school year.[3]   Pierce Dep. 24:24-25, 25:1-9.   In
addition, during March 2006, parents began to complain about
Pierce's conduct as director of the school musical, including
claims that Pierce did not allow their children to participate in
the production.   Mallon Aff. ¶ 10.

Consequently, defendants claim they regarded Pierce as a
disciplinary problem.   Mallon Aff. ¶ 24.   Superintendent Arbolino
discussed Pierce's behavior during an April 2006 Board of
Education meeting after receiving complaints from parents and
administrators.   Among the matters discussed during this meeting
was Pierce's DUI arrest.   Following the meeting, the Board
ordered Pierce to have a medical examination.   Letter from
Arbolino to Pierce, June 2, 2006 (Ecker Decl., Ex. P).   The
examination led the doctor to recommend that Pierce enter a
detoxification program for his drug abuse and undergo psychiatric

---

[3]      Pierce concedes that he was continually absent from the
school, stating that these absences were the result of his being
discouraged and humiliated by his assignment to the In-School
Suspension Room, discussed *infra*.   According to Pierce, he "found
being in ISS very discouraging and very humiliating.   It made
going to work an awful ordeal.   And those days, when the room was
empty, I started taking the next day [off] after the room was
empty.   I would always take that day because I couldn't take a
chance I was going to be sitting in an empty room two days in a
row.   So if I was sitting in an empty room one day, I would take
off the next day."   Pierce Dep. 110:20-25; 111:2-8.

evaluation. Letter from Medina to Arbolino, Aug. 10, 2006 (Ecker Decl., Ex. S). In addition, the Board of Education recommended that Trombetta monitor Pierce, and that Pierce prepare a Personal Improvement Plan. This plan was to include management strategies, behavioral expectations, and academic goals and objectives. Additionally, the Board of Education recommended that Pierce contact the District's Employment Assistance Program ("EAP"). Letter from Arbolino to Pierce, Sept. 5, 2006 (Shrewsberry Decl., Ex. G). Pierce, however, declined to contact the District's EAP, as he claimed he was already under the care of a therapist. Pierce Dep. 160:12-25.

In July 2006, Pierce was reassigned to the In-School Suspension Room (the "ISS") for the 2006-2007 school year.[4] At that time, Pierce was also informed that he would not be directing the school musical. Letter from Trombetta to Pierce, July 26,2006 (Ecker Decl., Ex. Q). According to Pierce, these reassignments were humiliating and degrading. Mallon Aff. ¶ 15.

During his time in ISS, Pierce, with Principal Trombetta's encouragement, worked on a new program in order to enhance the learning experience for students sent to the ISS. Pierce Dep. 47:21-25, 48:10-18. This program was not implemented as Pierce had expected, however, because many teachers stopped sending

---

[4]    The ISS Room is where students who have been suspended for infractions are sent. Typically, the instructor is responsible for monitoring the students' assignments and conduct.

their students to the ISS room.  Trombetta Dep. 97:16-22.
According to Pierce, this worsened his depression by making him
feel isolated from students and teachers.  Pierce Dep. 110:20-22.
Accordingly, Pierce alleges he "constantly" asked to be taken out
of ISS and reassigned to the classroom.  Pierce Dep. 32:21-24.

     In November 2006, Pierce's therapist wrote to Principal
Trombetta, informing him of her concern for Pierce since his
reassignment to the ISS, and her belief that his alleged anxiety
and depression symptoms were worsening as a result of his
isolation in the ISS.  Letter from B. Koskos to Trombetta, Nov.
7, 2006 (Ullrich Aff., Ex. 6).  Meanwhile, Trombetta worked with
Pierce on the Personal Improvement Plan.  This plan detailed
objectives, such as improving the learning environment in the
ISS, improving communication between the classroom teachers and
the ISS, strategies to carry out these objectives, and a timeline
to fulfill them.  Personal Improvement Plan, Sept. 8, 2006 (Ecker
Decl., Ex. W).

     In June 2007, Pierce was informed he would be returned to
the classroom for the 2007-2008 school year.  Mallon Aff. ¶ 25.
In September 2007, he was assigned to teach mathematics, which he
claims was "not his greatest strength."  Pierce Dep. 57:20-21.
His special education certification, however, qualified him to
teach all subjects.  Pierce Dep. 20:8-9.  Pierce's attendance was
once again problematic as he was absent thirty-five days between

September 10 and March 19, 2007. Highland Falls School District Employee Absences Report for James Pierce, Mar. 2008 ("Pierce Attendance Record") (Shrewsberry Decl., Ex. K).

In February 2008, the District filed disciplinary charges against Pierce and suspended him from teaching. These charges were based on claimed transgressions by Pierce, including excessive absences, sleeping at his desk while proctoring an exam, disrupting a student during an exam, and making inappropriate comments to a female student. Decision of the New York State Education Department Teacher Tenure Hearing Unit, Jan. 16 & 20, 2009 (Eckler Decl., Ex. AAA).

In February 2009, Pierce took early retirement, which he claims was forced on him by the District because it "deliberately placed [him] in positions that would undermine his mental health and his self-esteem and damage his career." Compl. ¶ 45. At that time, Pierce filed his complaint with this Court, alleging that the defendants' treatment of Pierce violated the ADA and the Equal Protection Clause of the United States Constitution.[5] Plaintiff alleges that, as a result of the District's actions, he has suffered "a loss of career opportunities and reputation, lost wages and pension benefits and extreme emotional distress, including extreme public humiliation, constant anxiety and other symptoms of extreme distress." Compl. ¶ 48. In December 2010,

---

[5]    During oral arguments, plaintiff's counsel withdrew Pierce's Equal Protection claim.

defendants filed a motion for summary judgment.

                          DISCUSSION

I. Summary Judgment Standard

     Summary judgment is "appropriate when there are no genuine

issues of material fact and the movant is entitled to judgment as

a matter of law." *Mescall v. Marra*, 49 F. Supp. 2d 365, 371

(S.D.N.Y. 1999). A genuine issue of material fact exists if

there is sufficient evidence on the record for a reasonable jury

to find in favor of the non-movant. *Id.* "In making its

determination, the court must resolve all ambiguities and draw

all reasonable inferences in favor of the non-movant." *Id.*

quoting *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d

144, 149 (2d Cir. 1998). "[S]ummary judgment must be entered

against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at

trial." *Id.*

II. Legal Framework for Claims Under the ADA

     Under the ADA, "no covered entity shall discriminate against

a *qualified individual* on the basis of *disability* in regard to

job application procedures, the hiring, advancement, or discharge

                              8

of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2006) (emphasis added). A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id*. § 12111(8). A "disability," with respect to an individual, is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such impairment." *Id*. § 12102(1).

The ADA is specifically intended to ensure that "truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps." *Francis v. City of Meriden*, 129 F.3d 281, 286 (2d Cir. 1997). To establish a prima facie case of employment discrimination under the ADA, a plaintiff must show:

> (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. Each element must be established for an ADA plaintiff to prevail at trial."

*Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004).

Under the burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), an employee bears the initial burden of proving by a preponderance of evidence that he was discriminated against. *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998). The establishment of a prima facie case of discrimination "gives rise to the presumption that the employer discriminated against the employee in an unlawful manner." *Id.* Once a prima facie case has been established, the burden then shifts to the employer, who must provide evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If the employer meets this burden, the presumption of discrimination is rebutted. *Id.* In order to prevail, a plaintiff then must establish by a preponderance of evidence that his employer's reason for its actions are not genuine, but rather a pretext for discrimination. *Id.*

III. The District's Motion for Summary Judgment

By its motion, defendants argue that Pierce's ADA claim fails as a matter of law for four reasons. First, Pierce is not a qualified person within the meaning of the ADA because he was incapable of performing his job with or without reasonable accommodation. Second, Pierce does not have a disability within

10

the meaning of the ADA. Third, Pierce was not perceived or regarded as having a qualified disability. Fourth, the actions against him were taken for legitimate, non-discriminatory reasons.

A. "Qualified Individual" Within the Meaning of the ADA

Defendants first argue that, even assuming that Pierce was disabled within the meaning of the ADA, he is not a "qualified individual" under 42 U.S.C. § 12111(8). That is, defendants insist that Pierce's undisputed conduct demonstrates that he was unable to carry out the essential functions of his employment, such as attending work and successfully teaching his students, with or without reasonable accommodations. Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") 9-11.

The court agrees. The record demonstrates that Pierce was not a "qualified person" under the ADA because his undisputed misconduct and transgressions show that he was incapable of performing the functions of a special education teacher, with or without reasonable accommodation.

Pierce's persistent absence from work, alone, precludes him from being considered qualified under the ADA. To be a qualified individual, "in addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate those skills by attending work on a regular

11

basis." *Mescall*, 49 F. Supp. at 374 (finding that the ADA "does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability"). Plaintiff admits that during the 2006-2007 school year he was absent forty-four times, and that during the 2007-2008 school year he was absent thirty-five days between September 10 and March 19.   The ADA does not require an employer to make a reasonable accommodation for an employee who does not attend work, nor does the Act require an employer to retain such an employee.   "Attendance is an essential function of employment." *Bobrowsky v. New York City Bd. of Educ.*, No. 97 CV 874, 1999 U.S. Dist. LEXIS 14528, at *13 (E.D.N.Y Sept. 16, 1999); *see Davis v. Bowes*, No. 95 Civ. 4765, 1997 U.S. Dist. LEXIS 16258, at *49 (S.D.N.Y. Oct. 20, 1997) ("[A]n employee cannot be considered otherwise qualified when she is unable to report to work at the time required, because she is not able to perform the essential functions of her job."); *Mescall*, 49 F. Supp. at 374 (finding a school counselor who missed forty-one days of school over a two-and-a-half year period to be unqualified under the ADA).   Thus, regardless of whether Pierce had the necessary teaching skills, he cannot be considered a qualified individual under the ADA based on his admitted failure to meet the attendance requirements of his employment.   *See Jackson v. Veterans Admin.*, 22 F.3d 277, 279-80 (11th Cir. 1994) (finding plaintiff's job as a housekeeper

12

had to be performed daily, and that plaintiff did not satisfy the "otherwise qualified" requirement of the ADA because his absences were "sporadic and unpredictable").

In addition, Pierce's misconduct while performing in his capacity as a teacher further prevents a finding that he is a qualified individual.  In addition to being continually absent, he was hostile to and argumentative with other teachers in front of students, fell asleep during class and while proctoring exams, did not utilize a textbook or outline a curriculum, and used profanity when talking with students.  Pierce Dep. 58: 17-24, 59:5-11; Pierce Attendance Record (Ecker Decl., Ex. CCC); Mem. from Trombetta to Pierce, Mallon and Johndrow, Mar. 19,2007 (Ecker Decl., Ex. KK); Mem. from Trombetta to Pierce, May 7,2007 (Ecker Decl., Ex. NN); Mem. from Clesia to Trombetta, June 11,2007 (Ecker Decl., Ex. OO); Mem. from Trombetta to Pierce, Jan. 18, 2007 (Ecker Decl., Ex. FF).

Trombetta's undisputed testimony is that he had conversations with Pierce regarding his use of "profanity in the classroom" as "there [is] certain language that's acceptable and professional and there's certain language that's not. [He] felt [Pierce] crossed the barrier to that."  Trombetta Dep. 49:7-9. Additionally, Trombetta chastised Pierce for confronting another teacher, which "disturbed 24 students' educational process." Trombetta Dep. 117:7-8.  Trombetta testified that "we don't as an

13

adult scream and holler at another adult in an education setting. It is not a professional behavior." Trombetta Dep. 17:8-10. Moreover, he criticized Pierce for allowing students to play cards in the ISS because "this was [not] part of the educational setting that we should have." Trombetta Dep. 121:24-25. All of these incidents, which Pierce concedes transpired, demonstrate that he was either not capable of, or reluctant to, perform the functions of his job as a teacher.

Although Pierce does not dispute his chronic absenteeism and misconduct, he argues that he is still entitled to relief because the defendants did not provide adequate accommodations. In support of this contention, plaintiff offers his therapist's testimony that, after defendants reassigned Pierce from the ISS to the classroom and his misconduct continued, defendants should have accommodated plaintiff by either allowing him to work part-time or sending him away to treatment. Koskos Aff. ¶¶ 33, 34. These proposed accommodations, however, do not constitute "reasonable accommodations." *Aquinas v. Fed. Express Corp.*, 940 F. Supp. 73, 79 (S.D.N.Y. 1996).

Although "reasonableness is normally a question of fact, summary judgment may be granted in cases where, as here, the plaintiff's proposed accommodation 'would eliminate the essential functions of the job.'" *Id.* (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 141 (2d Cir. 1995)). Plaintiff's

14

proposed accommodations would eliminate the requirement of regular attendance, which is essential to his employment as a teacher.

Moreover, defendants offered Pierce therapy sessions with the EAP. Pierce declined to accept the District's proposal, claiming that he had his own therapist. A reasonable accommodation, however, "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable." *Fink v. New York City Dep't of Pers.*, 53 F.3d 565, 567 (2d Cir. 1995).

Based on the foregoing, Pierce has failed to establish that he is a qualified person as required to make out a prima facie case of discrimination under the ADA. In other words, there is no issue of material fact as to whether plaintiff, with or without reasonable accommodation, was willing and able to perform the essential functions of his employment. The determination of what constitutes an "essential function" of employment is left "to the employer's judgment." 29 C.F.R. § 1630.2(n)(3)(I) (2010). Here, defendants properly exercised that judgment in deciding that, in order to effectively operate a school, its teachers were required to not only be in attendance regularly, but to behave in a professional manner, and to refrain from abusive and disruptive conduct. Thus, Pierce has failed to establish that he is a "qualified person" capable of performing

15

the essential functions of his employment. Because this is a necessary element of plaintiff's claim under the ADA, that claim fails as a matter of law.

    B. "Disability" Within the Meaning of the ADA

        *1. Physical or Mental Impairment*

Defendants argue that, even if Pierce were considered a qualified person under the ADA, his claim would still fail as a matter of law because drug abuse is not a physical or mental impairment that is recognized as a disability under the ADA. Defs.' Mem. 3-5. Defendants also contend that Pierce's depression, even if categorically recognized as a disability under the ADA, did not limit a major life activity, and therefore does not constitute a physical or mental impairment for ADA purposes. Defs.' Mem. 5-8.

The undisputed evidence shows that throughout his employment with the District, Pierce continually engaged in the misuse of prescription drugs. The illegal use of drugs is expressly excluded as a disability under the ADA. 42 U.S.C. § 12114(a). The "illegal use of drugs" is defined as "the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act." *Id.* § 12111(6)(A). Pierce's addiction to and misuse of prescription drugs falls into this category because "'[t]he illegal use of drugs' does include 'illegal misuse of pain-killing drugs which are controlled by

prescription.'"  *Toscano v. Nat'l Broadcast Co.,* No. 99 CIV.
10006, 2000 U.S. Dist. LEXIS 17030, at *8 (S.D.N.Y. 2000) (citing
*Neilsen v. Moroni Feed Co.*, 162 F.3d 604, 611 n.2 (10th Cir.
1998)).

Although the "illegal use of drugs" does not generally
include the use of a drug under the supervision of a licensed
physician, 42 U.S.C. § 12111(6)(A), it is unlawful under the
Controlled Substances Act to "knowingly or intentionally . . .
acquire or obtain possession of a controlled substance by
misrepresentation, fraud, forgery, deception or subterfuge" as
Pierce has done here.  21 U.S.C. § 843(a)(3). Pierce admits to
obtaining several prescriptions from various doctors who were
unaware "that [he] was getting other prescriptions for those
[painkillers] from other people at the same time."  Pierce Dep.
37:9-11.  Therefore, due to Pierce's behavior, his addiction is
not covered as a disability under the ADA.

Depression, on the other hand, can be considered a
disability under the ADA if it substantially limits a major life
activity.  *See Davis v. Westchester Cnty. P.R.C.*, 309 F. Supp. 2d
587, 593 (S.D.N.Y. 2004).  For purposes of the ADA,
"substantially limits" means:

> (i) Unable to perform a major life activity that the
> average person in the general population can perform;
> or (ii) Significantly restricted as to the condition,
> manner or duration under which an individual can
> perform a particular major life activity as compared to
> the condition, manner or duration under which the

17

average person in the general population can perform
that same major life activity.

29 C.F.R. § 1630.2(j)(1). "Major life activities" are
defined by regulation as "caring for oneself, performing
manual tasks, seeing, hearing, eating, sleeping, walking,
standing, sitting, reaching, lifting, bending, speaking,
breathing, learning, reading, concentrating, thinking,
communicating, interacting with others, and working."  29
C.F.R. § 1630.29(h)(2)(i).  The inquiry into whether a
disability substantially limits a major life activity must
be made on an individual basis.  29 C.F.R.
§ 1630.29(j)(1)(iv).

Pierce contends that his depression substantially
limited his ability to perform the major life activity of
working.  The Supreme Court has held that "when the major
life activity under consideration is that of working, the
statutory phrase 'substantially limits' requires, at a
minimum, that plaintiffs allege they are unable to work in a
broad category of jobs."  *Sutton v. United Air Lines*, 527
U.S. 471, 491 (1999).  In other words, the inability to
perform a particular job does not constitute a substantial
limitation on the major life activity of working.  29 C.F.R.
§ 1630.2(j)(3).

Here, Pierce insists that he was only incapable of
working in the ISS room.  He testified that he believed he

18

was still capable of teaching special education, and that
his work and ability to think clearly were not affected by
his drug abuse or depression. Pierce Dep. 118:2-18. The
assertion that he could not work in the ISS, however, does
not constitute a substantial impairment under the ADA
because working in the ISS is an individual task, rather
than a broad class of jobs. *See Sutton*, 527 U.S. 471
(finding that plaintiff was not disabled under the ADA
because a global airline pilot is not a "broad class of
jobs," but rather a specialized position); *see also Kramer
v. Hickey-Freeman, Inc.*, 142 F. Supp. 2d 555, 559 (S.D.N.Y.
2001) (concluding that because plaintiff made it clear that
he believed he was able to work, he was not disabled within
the meaning of the ADA). Thus, Pierce is unable to
establish that his depression substantially limited the
major life activity of working.

Pierce also claims that his depression has
substantially limited his ability to perform the major life
activities of caring for himself and maintaining private
relationships. He does not, however, offer competent
evidence to support this claim. Rather, the only evidence
plaintiff offers is the conclusory statements of his
therapist that his "symptoms became more pronounced and
included a decreased ability to relate to others, mood

19

swings, inability to concentrate, poor judgment, increased
difficulty in the activities of daily living such as getting
out of bed, showering, eating, brushing teeth and sleeping."
Koskos Aff. 15.  Pierce himself, however, testified that
while his depression caused "difficulty in all kinds of
relationships" and that he "tended to isolate himself,"
there were no particular incidents in which his inability to
care for himself or maintain personal relationships was
substantially limited by his purported condition.  Pierce
Dep. 13:24-25, 14:2-6.  Accordingly, the court holds that
plaintiff has failed to raise a genuine issue of fact as to
how his depression substantially limited one or more major
life activities.  Thus, Pierce has not established that he
has a "disability" within the meaning of the ADA and,
therefore, his claim fails as a matter of law.

2. *"Regarded As" Disabled Within the Meaning of the ADA*

Pierce argues that even if he was not disabled,
defendants regarded him as disabled and discriminated
against him based on this perceived disability.  As noted,
another way to prove disability under the ADA is to show
that the plaintiff is "regarded as having an impairment"
that substantially limits one or more major life activities.
29 C.F.R. § 1630.2(g)(1)(iii).  Whether an individual is
"regarded as having a disability turns on the employer's

20

perception of the employee and is therefore a question of intent, not whether the employee has a disability." *Colwell v. Suffolk Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998). In order to satisfy this standard, Pierce must show that the District regarded him as having an impairment that substantially limited a major life activity. *Id.*

Pierce contends that he was regarded as disabled by the District because it knew or should have known about his disability. He argues that the District knew of and expressed concern about his drug addiction, as evidenced by the fact that he was sent for a medical examination following his arrest for DUI, was transferred to the ISS room, was demoted as Chair of the Special Education Department, and Trombetta acknowledged that his behavior had changed and was troubling. Trombetta Dep. 51:20-23. Moreover, plaintiff points out that his therapist testified that "no one who had any regular contact with plaintiff, including his principal . . . and his colleagues could have failed to recognize that he was a deeply disturbed person who needed assistance and probable accommodation. His conduct during work [was] . . . the conduct of a man suffering from mental illness." Koskos Aff. ¶ 29.

Defendants counter that Pierce was not perceived or regarded as having a disability that limited a major life

21

activity because they did not view Pierce as being excluded

from a broad class of jobs. According to defendants,

Pierce's assignment to ISS was not intended to exclude him

from teaching opportunities, and indeed it demonstrates that

they believed he could still perform as a teacher. In fact,

following his year in the ISS room, Pierce was assigned to a

regular classroom. Defs.' Mem. 13. According to

defendants, the fact that both Trombetta and Arbolino

testified that they did not consider Pierce to be disabled,

and Pierce admitted that he never informed them that his

behavior was attributable to his alleged disabilities,

demonstrates that Pierce was not regarded as disabled. *Id.*

at 12. For defendants, although Trombetta was aware that

Pierce had been in programs for drug rehabilitation and was

seeing a psychotherapist, this "general awareness is

patently insufficient to place Mr. Trombetta, Dr. Arbolino,

or the District on notice that plaintiff was substantially

impaired in a major life activity as a result of addiction

or depression." Defs.' Mem. 8.

The court finds that the record is insufficient to

raise a genuine issue of fact as to whether any of the

defendants perceived Pierce as having an impairment that

substantially limited one or more major life activities.

Pierce's claim that his assignment to the ISS room shows

that the District regarded him as disabled is unconvincing because the District reassigned him to teaching special education the following year.  This demonstrates that he was not regarded as substantially limited in his ability to work as a teacher for the District, but rather, that defendants had confidence in his ability to teach students.  Similarly, Trombetta's acknowledgment that Pierce's behavior was troublesome does not mean he regarded Pierce as disabled.  An inferential leap from troublesome behavior to disability cannot be made.

To prove he was regarded as substantially limited in his ability to do work, Pierce bears the burden of showing that the District regarded him not only as unable to work in his specific job, but incapable of performing a "broad range of jobs as compared with the average person having comparable training, skills, and abilities."  *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 82-83 (2d Cir. 2000).  The fact that Pierce was transferred to ISS for one school year, and was demoted as head of the Special Education Department and as director of the school musical is insufficient, especially since these actions were directly related to Pierce's poor performance and were reversed in 2007 when he was assigned to teach mathematics.

Pierce also insists that he was regarded as disabled because the District ordered him to undergo a medical exam after his DUI.  This contention cannot support a claim that plaintiff was regarded as being disabled.  A request for a medical examination is "not equivalent to treatment of the employee as though [he] were substantially impaired.  Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims."  *Doe v. Bd. of Educ.*, 63 Fed. Appx. 46, 49 (2d Cir. 2003)(finding defendant's request that plaintiff undergo a physical examination did not "support an inference that the [defendant] regarded [plaintiff] as disabled").  Moreover, "a covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity.  A covered entity may make inquiries into the ability of an employee to perform job-related functions."  29 C.F.R. § 1630.14(c).  Therefore, standing alone, this action does not prove that the District regarded Pierce as disabled.

Following the ordered medical exam, the physician did not note any connection between Pierce's drug dependence and his misconduct.  The school board members testified that if any issues were discovered during Pierce's medical exam, he should be treated "with the goal towards improvement of his

behaviors. There were no discussions aimed at getting
Pierce fired." Kopald Dep. 54:15-23, Sept. 17, 2009.
Therefore, there is insufficient evidence to raise an issue
of fact as to whether Pierce was "regarded as" disabled
within the meaning of the ADA. Accordingly, Pierce's ADA
claim fails as a matter of law.


C. Reason for Termination

Finally, defendants maintain that the District had
legitimate, nondiscriminatory reasons for reassigning
Pierce, which defeats Pierce's claim as a matter of law.
Specifically, defendants point to Pierce's misconduct toward
students and other teachers. Defs.' Mem. 19. Pierce
counters that his assignment to the ISS room, without any
explanation, was an adverse action that was humiliating and
degrading. Pl.'s Mem. in Opp. to Mot. for Summ. J. 24.
Pierce therefore contends that a jury could find that the
District took these actions not to protect the students, but
rather to punish him and force him to retire, thereby
constituting constructive discharge. The court will not
consider the constructive discharge issue because plaintiff
is not a qualified individual as a matter of law, and does
not have a disability within the meaning of the ADA. Hence,
plaintiff's ADA claim as a whole fails.

Furthermore, the court finds that even if Pierce were able to establish a prima facie case of disability discrimination, the defendants have offered adequate non-discriminatory reasons for their actions. Once plaintiff has established his prima facie case for discrimination, the "burden shifts to the employer to articulate a legitimate, non-discriminatory purpose for its adverse employment action. Any such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision." *Austin v. Ford Models*, 149 F.3d 148, 153 (2d Cir. 1998). If the "employer satisfies that burden, the plaintiff may still prevail, but 'only if [the] employer's proffered reasons are shown to be a pretext for discrimination.' To make this showing, the plaintiff must demonstrate both that the [proffered] reason was false, and that discrimination was the real reason." *Id*. (internal citations omitted).

Pierce does not dispute the District's evidence regarding his absences and misconduct. Based upon this undisputed evidence, the District's legitimate interest in operating an efficient school and protecting its students from Pierce's erratic behavior, as well as his excessive absences, hostility towards other teachers, and continuous

drug abuse, provide legitimate, nondiscriminatory reasons for defendants' actions. *See Cutler v. City of New York*, No. 09 Civ. 5335, 2010 U.S. Dist. LEXIS 97435, at *12 (S.D.N.Y. Aug. 16, 2010) (finding that the school district's "interest in preventing teachers who use illegal drugs from endangering children in the City's schools was legitimate"); *Milagros Canales-Jacobs v. New York State Office of Court Admin.*, 640 F. Supp. 2d 482, 500 (S.D.N.Y. 2009) ("[O]n-the-job misconduct and poor work performance always constitute legitimate and nondiscriminatory reasons for terminating employment, even where the misconduct is caused by an undivulged psychiatric condition.").

It is well recognized that a distinction must be made between discrimination based upon a disability, which is prohibited by the ADA, and discrimination based upon misconduct by a disabled person, which is not prohibited by the ADA. *See Milagros Canales-Jacobs,* 640 F. Supp. at 500 ("[T]he ADA does not excuse workplace misconduct related to a disability."). It is undisputed that Pierce engaged in misconduct and the District was not required to tolerate this behavior. Pierce's misconduct was not protected under the ADA, even if he did have a recognized "disability." Accordingly, the District had legitimate, nondiscriminatory

27

reasons for the actions it took, and defendants are entitled to judgement as a matter of law.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted, and plaintiff's claims are dismissed in their entirety.

/S/    Richard K. Eaton

Judge

Dated:    September 28, 2011

New York, New York

28